## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| MARCH ASSOCIATES CONSTRUCTION, INC., <br><br> Plaintiff, <br><br> v. <br><br> PAWTUCKET DEVELOPMENT GROUP, LLC, CITIZENS BANK, N.A. <br><br> Defendants. | Case No. _____ <br><br> *Document Electronically Filed* <br><br><br> **COMPLAINT** |

Plaintiff, March Associates Construction, Inc. ("March"), by and through its attorneys, Gibbons P.C., by way of Complaint against Defendant, Pawtucket Development Group, LLC ("Pawtucket" or "Owner"), and Citizens Bank, N.A. hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is a breach of contract action arising from the redevelopment of the historical Lippitt Mill into residential housing (the "Project").

2.      Pawtucket was the developer and/or owner of the Project, and hired March as the construction manager.  After Pawtucket's financing collapsed, it was no longer able to fulfill its financial obligations under its contract with March and it failed to pay March amounts due and owing for work performed.  After numerous failed attempts to revive the Project, March terminated the parties' contract.  Pawtucket has failed to pay March more than $1.3 million due and owing for work March performed.  This is an action to recover March's contractual damages and other necessary relief.

## THE PARTIES, JURISDICTION & VENUE

3.     March is a commercial construction management company and general contractor, offering full-service construction, project management, and consulting services.

4.     March is incorporated and existing under the laws of the State of New Jersey, having its principal place of business located at 601 Hamburg Turnpike, Wayne, New Jersey.

5.     March is a citizen of the State of New Jersey for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

6.     Pawtucket is a limited liability company organized under the laws of the State of Rhode Island, having its principal place of business located at 148  West River Street, Suite 1E, Providence Rhode Island, 02904, and is a citizen of the State of Rhode Island for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

7.     Citizens Bank N.A. is headquartered at One Citizens Plaza, Providence, Rhode Island, 02903, and is a citizen of the State of Rhode Island for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

8.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, inasmuch as March and defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.00.

9.     Venue in the United States District Court for the District of Rhode Island is proper pursuant to 28 U.S.C. § 1391(b) because Pawtucket resides in this District and a substantial part of the events giving rise to this action occurred in this District.  Additionally, the parties contract specifies Rhode Island as the venue.

## BACKGROUND

10.     Lippitt Mill is a historic textile mill located at 825 Main Street, West Warwick, Rhode Island.

11.     Over the last ten years, multiple developers have tried to develop this property, without success.

12.     Pawtucket has been attempting for several years to develop this Project with various sources of financing.

13.     On June 16, 2017, Pawtucket entered into a contract with March (with March as the Construction Manager) ("Contract").  (Ex. 1, Contract.)

14.     At this time, the plans were still in development and the Contract did not have a guaranteed maximum price ("GMP"), which March would thereafter develop with the Owner.

15.     Pursuant to an October 30, 2017 amendment, the GMP for the Contract was $9,966,725.95, and the substantial completion date was November 1, 2018—in other words, a one-year schedule for substantial completion. (Ex. 2, GMP Amendment.)

16.     On January 10, 2018, March executed and provided a Payment Bond and Performance Bond for the Project from QBE Insurance Corporation, naming Pawtucket and Citizens Bank, N.A. as obligees.  (Ex. 3, bond.)

## DELAYS AT PROJECT INCEPTION DUE TO LACK OF FUNDING.

17.     March mobilized on the Project on or about July 1, 2017.

18.     March's first four (4) payment requisitions (July, August, September, October 2017) were not paid until January 2018.

19.     In January 2018, Pawtucket closed on a $9 million construction loan with Citizens Bank.

20.     At or around January 2018, Pawtucket represented to March that its additional financing came from various other sources, including Federal Historical Tax Credits, State Historical Tax Credits, Low Income Housing Tax Credits.

21.     At this time, March was led to believe that Pawtucket could pay for the Work.[1]

22.     However, as March would later learn, these sources were not closed and available, and indeed were illusory.

## PROJECT DELAYS AND MISMANAGEMENT CAUSED BY OWNER.

23.     Project delays outside March's control continued in 2018.

24.     The building permit was not issued until March 1, 2018, which severely disrupted March's schedule and the mobilization of Subcontractors (some of which had to begin work under winter conditions).

25.     Moreover, the poor condition of the plans and drawings led to numerous delays, all of which were outside of March's control.  For example, there were no structural plan details necessary to price numerous items of Work, no interior wall details at Mill #2, and no floor plan layout for Mill #1.

26.     Likewise, numerous requests for information ("RFIs") were ignored by the Owner and its professionals.

27.     All of this crippled and delayed the Project from its inception.

28.     Throughout 2018, the Work progressed and Pawtucket paid March for its Work (albeit with some delays).  However, delays were already accumulating due to causes outside of March's control, most critically, the lack of plans for the demolition and rebuilding of Mill #2.

---

[1]  Capitalized terms have the meaning set forth in the Contract unless otherwise defined herein.

29.     Mill #2 was delayed from inception, and affected the coordination and critical path of other aspects of the Project.  In 2018, there was a large scope change to demolish Mill #2 (rather than just retrofit it), which caused a multi-month delay.

30.     Mill #2 was demolished in November 2018, but there were no construction drawings for many more weeks, causing a sizable delay into 2019.  The problems with the lack of design for Mill #2 were solely attributable to the Owner and outside of March's control.

## PAWTUCKET'S FINANANCING COLLAPSES AGAIN

31.     In 2019, Pawtucket's financing once again collapsed and it stopped making timely payments.

32.     Having not been paid in some time, March put Pawtucket on notice of this default. March also requested that Pawtucket provide March with sufficient evidence that Pawtucket had made financial arrangements to fulfill its obligations under the Contract up to and including Final Completion and Final Payment to March.   (Ex. 4, April 4, 2019 letter.)

33.     When Pawtucket did not do so and continued to be unable to pay March for work performed, March stopped work from April 2019 through September 2019 due to lack of payment and the financing issues Pawtucket was experiencing.

34.     March's January 2019 requisition was not paid until June 2019; and March's combined February/March/April requisition was not paid until August 2019, despite the fact that Pawtucket did not dispute any of the Work billed therein.

35.     After Pawtucket made the long-overdue payments in August, and with Pawtucket's representation that payments would be made on a timely basis going forward in order to support the work continuing on the Project, March returned to the Project site and resumed work in September 2019.

36.     However, the Owner failed to timely pay the first payment requisition submitted by March upon its return.

37.     At that time, March had only received two (2) payments for work performed in calendar year 2019, the Project had experienced multiple disruptions due to the Owner's failure to timely pay and the financial difficulties the Owner was experiencing, and the Owner had not provided confirmation that it had made financial arrangements to fulfill its obligations under the Contract.

38.     As a result, March stopped the Work and left the Project site again in November 2019.

**THROUGHOUT 2020, OWNER NEVER PROVIDED EVIDENCE OF FINANCING.**

39.     In January 2020, March checked-in with Pawtucket as to the status of its financing and ability to re-start the Work.  Pawtucket advised that it was having problems with its tax credit equity investors.

40.     The lack of certainty continued throughout early 2020 (and the onset of the COVID-19 pandemic).  On March 24, 2020, Pawtucket indicated that new financing was on its way, via a new investor (Boston Capital) and additional equity from the Owner.

41.     Pawtucket also agreed that some COVID related extension of the schedule would need to be discussed, should the Work resume.  However, the financing was still not in place for March to resume the Work.

42.     Indeed, by April 2020, there was still no funding in place and no path forward to re-start the Work.  Around this time, Pawtucket requested, and March delivered, a proposed schedule and budget for completing the Work.  However, without evidence of financial ability to pay, there was no ability for March to re-start the Work.

43.     On July 10, 2020, Pawtucket wrote a letter to March and its surety claiming that March had failed to supply adequate manpower to the Project.  (Ex. 5.)  This letter contained false or misleading statements and was sent in bad faith, as Pawtucket was well aware that March had stopped the Work due to Pawtucket's lack of payment.  Pawtucket also alleged—without ever offering evidence—that March was overpaid for certain items of Work.  (*Id.*)

44.     March responded to Pawtucket's letter on July 28, 2020.  March rejected the statements in Pawtucket's letter, and stated that it was open to continuing discussions about remobilizing at the Project site, but needed Pawtucket to provide reasonable evidence that it had made financial arrangements to fulfill its obligations under the Contract.  (Ex. 6.)

45.     Additional letters were exchanged on August 4, 2020 (Ex. 7), August 7th (Ex. 8), and August 12th (Ex. 9).

46.     A bond conference was held on August 10, 2020.  On that call, Pawtucket initially suggested that financing was in place to fulfill its obligations under the Contract, but later stated that the closing on such financing had not yet occurred.  Pawtucket stated that the closing was expected to occur shortly.

47.     In late August and early September 2020, the parties discussed and negotiated potential terms for a "Remobilization Agreement."  However, there was simply no path forward for March, in large measure because Pawtucket ultimately admitted that it did not have sufficient financing to fulfill its obligations under the Contract and that no closing for additional financing had been scheduled.

48.     At this time, March had a Contract balance of $3,219,707.77 to complete the Work, and Pawtucket admitted it had less than $3 million available, a substantial portion of which was for "soft costs" (i.e., not for March's Work).

## MARCH TERMINATES THE CONTRACT DUE TO
## PAWTUCKET'S NUMEROUS MATERIAL BREACHES

49.     After several weeks of good faith negotiations as to a Remobilization Agreement failed, March terminated the Contract on September 28th.  (Ex. 10.)

50.     March's contractual right of termination under these circumstances was clear.

51.     Pursuant to the Contract, Pawtucket was required to provide, at March's request, "reasonable evidence that the Owner has made the financial arrangements to fulfill the Owner's obligations under the Contract."  (Contract, General Conditions, § 2.2.1; *see also* Contract § 3.1.2 (requiring the Owner to "provide reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract.").  Importantly, "[u]nless such reasonable evidence is furnished, the Construction Manager is not required to . . . continue any Work."  (Contract, General Conditions, § 2.2.1.)

52.     Pursuant to Section 14.1.1(4) of the General Conditions, March had the right to terminate the Contract where the "Owner has failed to furnish to the Construction Manager promptly, upon the Construction Manager's request, reasonable evidence as required by Section 2.2.1."

53.     Additionally, March was entitled to bill monthly, and to receive payment on its requisitions within thirty (30) days of submission.  (Contract § 7.1.3.)  The Owner breached this provision throughout the majority of the Project.

54.     March also terminated pursuant to Section 14.1.1 of the General Conditions, wherein March had the right to terminate the Contract "if the Work us stopped for a period of 30 consecutive days through no act or fault of the Construction Manager."  Here, the Work was stopped since November 2019 due to the Owner's failure to pay Requisition 20 and failure to

provide evidence of financing necessary to complete the Work.  Therefore, March properly exercised its termination right due to the stoppage caused by the Owner's inability to pay.

55.     Relatedly, March also terminated pursuant to Section 14.1.2 of the General Conditions, wherein March had the right to terminate the Contract if, through no fault of its own, "repeated suspensions, delays, or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365 day period, whichever is less."  Section 14.3 addresses suspensions of the Work by the Owner for its own convenience.  This Project— originally scheduled to be completed within twelve (12) months—was more than **two years** delayed, including all of 2020 to date.  The Project was suspended well over 120 days in the last 365 days, and this suspension is not March's fault, thus entitling it to terminate under this provision.

56.     Lastly, March's termination was also pursuant to the common law, as Pawtucket committed additional material breaches, such as (a) failure to provide adequate plans (for example, there was no structural plan details necessary to price numerous items of Work, no interior wall details at Mill #2, no floor plan layout for Mill #1); (b) failure to respond to requests for information (for example, numerous RFIs, Submittal Logs, and PCOs would go unanswered for long periods time); and (d) the Owner's interference with March's subcontractors, for whom March is solely responsible.

57.     Pursuant to the requirements of the Contract, the parties' participated in a pre-suit mediation, which was unsuccessful.

## MARCH'S DAMAGES

58.   March is owed in excess of $1 million, including, but not limited, to the following components:

a.   ***Draw 20***:  March submitted Application and Certification for Payment ("Payment Application") No. 20 on October 31, 2019, in the amount of $298,175.83.  This was for Work performed through the date of the Payment Application.  There is no dispute that this Work was performed and Pawtucket has never disputed the amount due.

b.   ***Retainage***.  March is owed over $800,000 in retainage (a substantial portion of which is due to March's Subcontractors).

c.   ***Outstanding Account Receivables***:  Pawtucket did not pay several prior Payment Applications in full (notwithstanding the fact that it approved the full amount of the Payment Applications), and March is owed more than $35,000 for these prior Payment Applications.

d.   ***Additional General Conditions***:  Since the submission of Payment Application 20, March has incurred more than $24,000 in general conditions costs.

e.   ***Approved Change Orders***:  Pawtucket has approved and executed several change orders that March has not yet billed, or only billed in part (Change Order Nos. 21, 31, 65, 83, 85, and 86).  These total more than $150,000.

59.   March continues to accrue damages.

## COUNT I

### (*Breach of Contract against Pawtucket*)

60.   March repeats and realleges each and every allegation of the Complaint as if fully set forth herein.

61.   The Contract is a valid and enforceable agreement between March and Pawtucket.

62.   March duly performed its obligations under the Contract.

63.   Pawtucket, on the other hand, failed to fulfill its contractual obligations and materially breached the Contract by, among other things, failing to pay for the Work, causing delays to the Project, failing to provide reasonable evidence that it had made financial

arrangements to fulfill its obligations under the Contract, failing to provide adequate plans, failing to timely respond to RFIs (or ignore them entirely), and interfering with March's subcontractors.

64.     Pawtucket's aforementioned conduct constituted a material breach of the Contract.

65.     As a result of Pawtucket's breach, March has suffered damages.

## COUNT II

### (*Breach of Implied Covenant of Good Faith and Fair Dealing against Pawtucket*)

66.     March repeats and realleges each and every allegation of the Complaint as if fully set forth herein.

67.     The Contract required Pawtucket to exercise, at all times, the utmost good faith and to always deal fairly with March in its performance of its duties and obligations under the Contract by reason of the implied covenant of good faith and fair dealing.

68.     Pawtucket breached the implied covenant of good faith and fair dealing by acting in bad faith by, among other things, (1) sending a letter to March's surety that contained false or misleading statements; (2) misleading March about the sources of its financing and the status of same; and (3) inducing March to return to the Project in 2019 with false promises of rectifying various management problems on the Project.

69.     Pawtucket's bad faith conduct inhibited March's ability to perform the Contract and deprived March of its ability to receive the fruits of the Contract.

70.     Because of Pawtucket's bad faith conduct, March has suffered significant harm and damages.

## COUNT III

### (*Unjust Enrichment against Pawtucket*)

71.     Count III of the Complaint is pled in the alternative to the other Counts of the Complaint pursuant to Federal Rule of Civil Procedure 8(a)(3).

72.     In the event the Contract is deemed unenforceable, or that any amounts allegedly due and owing are determined to be not recoverable under the Contract, March is entitled to recovery under the doctrine of unjust enrichment.

73.     March provided general contractor services to Pawtucket, performed work on the Project, and incurred costs and expenses with an expectation that Pawtucket would pay for those services, work, costs, and expenses.

74.     Pawtucket has unjustifiably refused to pay March for its while simultaneously benefitting from the services March provided.

75.     Because of Pawtucket's unjustified actions, March has incurred substantial monetary loss and it would be inequitable to allow Pawtucket to retain the benefit of March's performance without payment.

## COUNT IV

### (*Declaratory Judgment against Pawtucket and Citizen Bank, N.A.*)

76.     March repeats and realleges each and every allegation of the Complaint as if fully set forth herein.

77.     These claims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

78.     As previously noted, March has a Payment Bond and Performance Bond for the Project, naming Pawtucket and Citizens Bank, N.A. as obligees.  (Ex. 3.)

79.     Under the terms of the Payment Bond and Performance Bond, the surety's obligations arise only "if there is no Owner Default" under the Contract.  (Bond, § 3.)

80.     As described above, the Owner has committed numerous defaults and breaches of the Contract.

81.     Therefore, the surety has no obligation under the Payment Bond or Performance Bond, and each bond should be discharged and the surety declared to have no further obligation to Pawtucket or Citizens Bank, N.A.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

(a)     Damages in an amount to be determined, plus any interest allowable by law;

(b)     Declaratory judgment discharging March and its surety QBE from any and all obligations under the Bond;

(c)     Awarding attorneys' fees and costs; and

(d)     Awarding Plaintiff such further relief as the Court deems just and proper.

Dated: December 3, 2020           By:  s/ Ethan D. Stein
       Newark, New Jersey              Ethan D. Stein, Esq.
                                       Rhode Island Bar No. 8428
                                       **GIBBONS P.C.**
                                       One Pennsylvania Plaza, 37th Floor
                                       New York, N.Y. 10119
                                       (212) 613-2000
                                       *Attorneys for Plaintiff,*
                                       *March Associates Construction, Inc.*
                                       estein@gibbonslaw.com

                                       Damian V. Santomauro, Esq. (*pro hac vice forthcoming*)
                                       Kevin W. Weber, Esq. (*pro hac vice forthcoming*)
                                       **GIBBONS P.C.**
                                       One Gateway Center
                                       Newark, N.J. 07102
                                       *Attorneys for Plaintiff,*
                                       *March Associates Construction, Inc.*
                                       dsantomauro@gibbonslaw.com
                                       kweber@gibbonslaw.com